In all cases, due to circumstances beyond anyone's control, Judge Thompson and Judge Barron will not be present in the courtroom this morning. Judge Thompson will be fully participating in the decisions in all of the cases this morning. So if you've tailored your arguments toward Judge Thompson, go forward and do that. Judge Barron will be participating by phone. So it's very important that you pay attention to the microphone because that's the only way that he can hear you. What else? I think that's it. That's it. Judge Barron, are you with us? I am, yeah. I can hear you fine. Okay. So the clerk may call the first case. Today's cases will be called as previously announced. The times will be as allotted to counsel. The first case today is No. 141582, U.S. v. Lanza-Vazquez. No. 14163, U.S. v. Estacio-Espino. No. 141715, U.S. v. Rivera-Casquillo. No. 171317, U.S. v. Estacio-Espino. And No. 171729, U.S. v. Estacio-Espino et al. Good morning, Your Honor. Inga Parsons, appointed counsel for Mr. Ramon Lanza-Vazquez. I'll be arguing on behalf of him and also the joined-er appellants in this case. I would like to reserve two minutes, actually, for Mr. Goldberger or his for the final. So there's only one of us doing the rebuttal. Two minutes. Two minutes. Okay. Thank you, Your Honor. On earth. The failure to hold a public trial is a structural error that infects the entire trial process. Indeed, the Supreme Court has made pristinely clear, quote-unquote, that the Sixth Amendment right to a public trial extends to the jury voir dire process. This is so because jury selection is a primary means by which a court may enforce the defendant's right to be tried by a jury free from ethnic, racial, or political prejudice or predisposition about the defendant's culpability. In this case, what it really boils down to is whether or not there was, in fact, a partial closure in this case. Judge Fuste found that there was. However, that, we believe, is plain error. Clear error review. Under clear error review, we defer to the district court's findings unless the record read as a whole gives rise to a strong, unyielding belief that a mistake has been made. As was said in Candelaria, if the judge incorrectly assessed the probative value, it can lead to a reliance on speculation. In this case, there were five witnesses that were called by the appellant who consistently testified that they were told that not everyone could come into the courtroom. That is a partial closure. The other parts of the analysis remain intact in the sense that all this court has to find is that there was clear error with respect to that finding. Let me get the numbers right. Five key witnesses. Three of them said they had no trouble getting in. Correct, Your Honor, but what they testified to was what they were told, that only one family member could come in. Family members. Exactly. And so you still have a partial closure. The difference between the partial closure and the full closure really comes down to whether or not a substantial interest was involved. We don't even have to get to that because there was no Waller analysis. The judge was not informed of the closure, and that was one of his findings, that no one said anything. But I find it interesting because if you look at the other cases, especially in Negron-Sostra, even the attorneys didn't object in that case because they thought that, in fact, was the policy. And that's kind of how we got here today because when Negron came out, it made clear that in Puerto Rico, in the district court, the default rule was that during the voir dire process was closed. Now, it comes down to who said this to these individuals. And Judge Buste had some concern about the inconsistencies and discrepancies. They are, in my view, a distinction without a difference because what was consistent was what was said with regard to whether they could come in or out. And the fact that some of them didn't remember what pants color there was, some of them didn't remember what their hair looked like, it's really a little value because these gentlemen were in uniform. Uniform is uniformity. They don't really stand out. What we do know, and this is actually from Judge Buste, is that there were other security officers that were present there that was also part of the security plan. And it's important because even if the courtroom, and this is from Negron, quoting Owens, even if the courtroom was closed because of inattention by the judge, courts have expressed concern in the past where a court officer's unauthorized closure of a courtroom impeded public access. And this is critical, that the courtroom closure was the result of inaction by the judge rather than an affirmative order is not dispositive. What matters is that the public was barred, and that's what we have in this case. Let me ask you this. You've mentioned the credibility determinations with respect to folks on the side of your cause here. Let's say, I mean, I assume that you agree that those sort of credibility determinations are typically given great deference, but let's say that there was no question about the credibility of those witnesses. Is there any question about the credibility of the witnesses on the other side, those who said that there was no closure, one? And two, if we end up in equipoise, then where are we? Answering first about the other side. Yes. There were two witnesses that were called by the government, and this is what's really critical. You have the CSO officer, Mr. Feliciencio, and I'm sorry if I'm mispronouncing that. I'll call him the CSO officer, Your Honor, is that he was the one who was really in charge of the jury in the internal aspects of the courtroom. He was not recognized by the five individuals who testified, and the judge, Judge Poussey, actually used that against them in terms of their own recollections. But, in fact, it actually supports our position because he was not the one that made those announcements. It was Marshall. So if you look at the CSO's description of that, he wasn't there all the time. He wasn't outside all the time. He wasn't at the door all the time. He actually had a microphone, and he was taking notes over to the individual jurors. A couple of the individual witnesses for the defense indicated that they had seen him, that they were in the courtroom, that they had seen him there, and that he was oftentimes away from the door. Additional security officers are part of the system that had a default rule that it would not be an open trial. Did they identify the marshals who were there? No, and that was the problem, Your Honor. If you look at the record, the defense appellants did not have the names of those officers, and this is what I think really makes a critical distinction here, which is that not one of the marshals who was on duty that day was called by the government. They have access to the names. They have access. And Ms. Sandoval, who is in court today, made that clear in the record. And that was problematic, Your Honor, because those individuals could have said that. And one of the things that you find with respect to the testimony, first of all, the clerk only indicated that she thought that she believed that the door had been opened and that no one had been barred, but she wasn't out there. She wasn't the one sitting out there. She wasn't there when someone told these individuals whether or not they could come in. So you don't have to find any of the witnesses on this government side to be incredible. All you can find is they don't have personal knowledge as what was said. And the interesting thing, too, is if you look at the testimony, when you look at what was said, there was no indication that they were, in fact, in the courtroom. So the officers, the CSO officer or the clerk didn't say, oh, yeah, I remember him being there during jury selection. He was sitting right there next to his wife. Or I remember that, you know, Jinko was in the courtroom as well. None of that testimony was. So really what you have is almost two universes. You have the inside of the courtroom universe and you have the outside of the courtroom universe. And the fact is is that even if the CSO believed that that was the policy of Judge Fouste, that was not the policy of the general courtroom and it was officers that were under, in the system, but not necessarily under Judge Fouste's rules, what I think it really comes down to, is I think Judge Fouste was so upset that something like that would happen and he wouldn't know about it that he basically told Ms. Sandoval, and you know, and I'm quoting from 1631 of the appendix, and you know that nothing is going to happen in this courtroom if I don't know about it or if I'm not aware of it or I'm not involved in it. My own view, Your Honor, which I think explains why there's clear error with respect to the findings that Judge Fouste made is that to him it's inconceivable that a security officer would say what they said. You have five witnesses against that and Judge Fouste was on the bench. And yes, he wants to control his courtroom. Let me, help me test my recollection of one part of the record. I thought that there was testimony that three benches were reserved for family members. Your Honor, it was reserved for the public, but that's a different issue. I thought it was three were reserved for family members. Am I wrong about that? My recollection of the record is that there were three, two and a half benches essentially that were reserved for the quote-unquote public. There was one for the press. There was a little part of one of those benches that was reserved for the marshal officer. But the fact that there was room wasn't the issue. No, that seems inconsistent with a statement that only one family member could. Because it wasn't about room, Your Honor. It wasn't about room. No, but why would you have three open benches and then say only one? It seems inconsistent. Because the inside of the courtroom wasn't dictating what was happening on the outside of the courtroom. What seems to be apparent is that that was a rule, a default policy in a sense, that an officer of the court who appeared to be a marshal, who is described as a marshal, was telling these individuals without actually knowing whether there was room because that wasn't the issue. This was a high-risk trial. It was a trial that clearly there was some concern. And the fact that you come into a context of a court that, in fact, made a default policy regardless of how much room was in, they weren't going to allow others. So before you step back, Judge Barron, do you have any questions of Ms. Parsons? Just one, which just concerns prejudice, which is I take it your argument is that it was a partial closure of the courtroom. And I'm just trying to figure out whether it's clear in your view that if it's just a partial closure, that that also is structural error and there's no prejudice inquiry. That's correct, Your Honor. Our position is that it's somewhat of an open question. There was the case, the Weaver case that came out that talked about that, but that was only in the context of a post-conviction 2255 ineffective assistance of counsel. Because here you have where it affects, the effect of it is affecting the substantial rights. It's also the fact that you have the appearance of unfairness that's also involved in that. Let me ask it a different way. Is there any clear authority that a partial closure is structural error for which there's no prejudice inquiry? Well, I think you take the regular structural error analysis that you find in public closure, and then you say, well, what's the difference between a public closure argument, a partial closure, and a full closure? And the issue on the two of those with respect to the First Circuit has to do with whether there has been a substantial risk. That's what changes it is the type of risk. Since we don't even have to get there under whether or not there was a Waller hearing and a finding, it still stays with the structural error analysis. I'm not sure I understand that. Are you saying you then would be entitled to a Waller hearing? No, Your Honor. My point is that when you're distinguishing between what's the difference between a partial closure and a full closure, in those instances it's the amount of interest, whether it's a substantial interest, which is all you need to do with respect to an overriding interest. Those are really the differences between what happens if you have a partial closure or a full closure. But in both cases, whether you have a partial or a full, you have an obvious error that affects the defendant's substantial rights and seriously impairs his fairness, integrity, or, and this is important, public recognition. Maybe I'm misunderstanding. You seem to be saying that if I have it right, that whether it's a momentary closure or a complete closure, there's no difference and it's the structural error for which you have to throw out the whole conviction. That's correct, Your Honor. Okay. And I'm just asking whether, what would be the precedent that you would point me to so that a momentary closure is identical to a closure of the entire proceeding? Well, I would refer the court to Negron v. Sostra at 305. Our precedent is, and they are citing Owens quoting Sullivan, our precedent is unequivocal. Structural error in the form of the denial of the public trial's right prejudice a defendant notwithstanding that the prejudice may be difficult to detect. And that's what I'm saying. Is that case a partial closure or a complete closure case? On my position, it does not matter because what you have done is that the principles of the- That wasn't my question. My question was whether Negron is a partial closure. Oh, it was a full closure. Yeah, so that's a- Do you have a case of a partial closure in which there is a clear holding from us or from any court that we treat it as structural error just like we do when it's a full closure? Well, the court in Bucci hinted at that. I mean, it wasn't some people- I mean, they hinted at the fact that you could have, in fact, a Sixth Amendment violation and there wasn't a need for prejudice in that case, but they didn't go on to reach that issue because they considered there had been a waiver of the rights. So they didn't- I see. So then I guess my last question is, just so I understand the standard of review, I recognize that it's factual finding about whether there was any closure at all. That's clear error. But since it wasn't raised below, are we on plain error review for purposes of the question that I'm asking as to whether a partial closure is treated as the same as a full closure for purposes of whether it's structural error? We are under a plain error review, yes. Okay, thanks. Thank you. Thank you. I'll rely on the papers for my other argument.  My name is Peter Goldberger. It's my privilege to represent Luis Daniel Rivera Carrasquillo, who was one of the defendants below and, of course, is one of the consolidated appellants here. I would like to add two minutes of my time to the rebuttal package that we've already begun with two minutes of Ms. Parsons' time, if I may, for a total of four minutes of rebuttal for me. So you're looking for four minutes. Okay. Yeah. So we decided it was impractical to have two lawyers rebut. Got it. And since we have adopted all the arguments, it's really not for one appellant or the other. My client joined, for example, seven of the eight arguments that are advanced in the briefs. And in the time available, I hope to touch on four of them that may be overly ambitious. That is the excessive and unnecessary use of gruesome photographs and a display of firearms in the courtroom, the denial of new trial under Rule 33b-1, the jury instruction, or mistakenly identifying firearms as a form of racketeering activity, and as I am here filling in for Ms. Cueira, who may today be delivering her first baby, for her client, Bernard Anastasio, the suppression issue. And I do not want to submit on that for her sake. So on the first point that I'm hoping to address, over objection, the trial court admitted more than 60 photographs of dead bodies. The judge himself, the trial judge, called these photographs brutal, gruesome, unbelievable. Those were the judge's words. We have included color reproductions of these exhibits in Volume 4 of our appendix so that you can see for yourself. Typically, ten were admitted of each crime scene and between two and four from each autopsy. They were not limited to victims in particular counts of the individual murders that underlay some of the Vicar counts, and in fact included in some instances victims not even mentioned in the indictment. That's how tangential to the heart of the trial some of it was. These photographs were projected in the courtroom, not treated discreetly. On top of that, there were 40 or more photographs of weapons that were allowed to be introduced, all over objection, and a physical display of numerous dangerous firearms in the well of the court during the prosecutor's closing argument, as well as showing the gruesome photographs again. This is the epitome of what Rule 403 was designed to prevent. Allowing this evidence was highly and unfairly prejudicial abuse of discretion. This is particularly true in this case when you couple it with the fact that the firearms in question were seized from my client, Mr. Rivera, at the time of his arrest, four months after the indictment had been returned, and never shown to have been involved in any of the charged crimes. So the firearms were not shown to be intrinsic, as Judge Fuste ruled alternatively on this objection, nor did they meet the criteria of Rule 404B for modus operandi evidence, which was the other justification that the judge broached, that is to say there was nothing unique about, sadly, nothing unique about these kinds of weapons in a case of this general kind. In fact, the record that we've cited and quoted shows Judge Fuste explaining his reasoning in ways that are explicitly propensity justifications. He says, your client was no choir boy, and comments like that that have absolutely no place in this kind of analysis. So this avalanche of unfairly prejudicial evidence could not be deemed harmless by any measure. The government's direct case is cooperating witnesses. Their credibility strongly attacked on cross-examination in every respect. Well, you're not saying that none of the photographs, or firearms for that matter, were admissible? No, I think that would be any judge would have allowed some measure to the extent they were helpful. So why is it so obvious that it's not harmless? Because 60 photographs of bodies and 40 of the guns is overwhelming. It's overwhelming. It's not one or two to the extent it's helpful to the coroner to explain the wounds, or only fair to the prosecutor who doesn't have to give, you know, the sanitized version of the story. But if some more limited number makes the point and are relevant, then how is it that the additional ones take it from harmless to harmful in a material sense? Well, defense counsel also proposed at sidebar that there were additional photographs that were less gruesome, less bloody, that could be used instead. And Judge Fuspe responded, show them to me. She didn't have those photographs with her from the discovery, as if to say, well, you decide what evidence to use against your client. And if she didn't, then he said, well, then you waived that objection. The difference between one or two pictures used of necessity with sensitivity to their unfairly prejudicial character and an avalanche of this evidence is what we're talking about. It's a bad – I mean, the crimes that are charged are bloody and violent. There's no avoiding that. But fundamentally the concern, right, is that the jury is going to make a decision on the wrong grounds. On an emotional basis, yes. So I'm still sort of trying to figure out where the line gets drawn. I know there's no precise line, but in a case like this where it would seem to me that some pretty gruesome photographs would be relevant, would be admissible, would not be unfairly prejudicial, then I'm having a little trouble on the harmless. I understand. Even if there was error. We don't shirk from saying it's an abuse of discretion standard. And there's a point at which it's up to two or three judges of the Court of Appeals to say we can't say exactly where the line is, but what happened here is over that line. Well, I was hoping you would help me in this particular case. It's a lot closer to one or two than to ten per crime scene, I can say that for sure. Chief Judge Howard, I have one question that's in the same vein. Sure. It would be helpful to me if you could walk through the analysis of why it's harmful, as to which offenses are you saying it's harmful, and how come the evidence of those offenses that was present, which would include, as Chief Judge Howard points out, at least some of the photographs, isn't enough to establish that although there may have been error in allowing more photographs, the additional accretion of those through some photographs or weapons pictures, what's the case for saying that it's so clear that that would make it harmful, notwithstanding the affirmative evidence that was presented to the jury that would provide a legitimate basis for the conviction? I understand your question. Well, first, I don't think that this is evidence that goes to one count or another. I mean, there was no, whether it be the RICO conspiracy or the drug distribution conspiracy involving firearms, or the bike car murders, it's all of a piece. I don't think that's it. I guess that's my problem with it. Since that's the case, it was all the affirmative evidence of the physical evidence of the weaponry. It was the testimony from numerous people about the defendant's participation in the offenses. So I'm just trying to get a sense of given the strength of the evidence that was put forward that you're not challenging, what's the basis and the fact that at least some photographs, through some crime scene photographs and some photographs of the weaponry, would be admissible? What's the ground for saying that the error in allowing more of these photographs shows that it was actually harmful as opposed to just error? Well, I'm not so sure that that distinction is clear in a Rule 403 setting. I mean, you don't have a Rule 403 error unless it's unfairly prejudicial. I don't think that's right. I think that's not quite right, and I think that's what may be the problem I'm having with your argument. In order for there to be a 403 error, it has to be unfairly prejudicial. But that's a separate question of whether the prejudice, the unfair prejudice, was harmful in a given case, because if the evidence is sufficiently strong, there's no problem in terms of overturning the conviction, even though it was error for the judge to have put in evidence that would be objectively unfairly prejudicial, because in the particular case, that prejudice was washed out by the overwhelming evidence of guilt. So the issue with this trial is not whether these brutal and bloody murders occurred, but whether these three defendants were the individuals who committed the particular offenses that were charged in this indictment. So the prejudicial effect is to overwhelm the jury by emotion and horror. So now you're focusing on the murders. So with respect to the murders, what's the evidence that the defendants committed the murders that was put forward? Is it all cooperator testimony? Yes, yes. And exclusively so? I believe that's true. I don't think there was any forensic evidence tying an individual defendant to an individual murder. That might not be so as to the helicopter incident that my client was not involved in. I can't say that's 100 percent right about that incident. But the other murders, the drug rivalry murders, I think it's true that it was all credibility of cooperators to put individual defendants in individual case accounts. And with respect to the offenses to which they're convicted that are not tied to the murders? Well, they still have to be, you're right, were they the people involved in the three? Right. So they're charged in three ways, in three counts. Is all the evidence on that score similarly cooperator evidence or some of it physical evidence? I think it's all cooperator evidence. What about the weapons that were found at a home in which the defendants were tied to? Well, that's the point I made a few minutes ago, that those weapons were, it was four months after the indictment. We say the government did not overcome and has pointed to nothing, although we challenged it in the briefing, to overcome the principle that the conspiracy is deemed to come to an end when its leaders and members are indicted and incarcerated. And there's no, some conspiracies do continue after indictment, but there was no showing that this one did. They have entirely a circular argument on that. Their only argument is, well, he had weapons with him when he was arrested. But those weapons could be, and more likely were, in furtherance of fugitivity than in furtherance of the conspiracy charged in the indictment. And none of those firearms, when seized, were then forensically tied to any of the murders. That's correct. If I could take my remaining minutes to move to other arguments. The motion for new trial, I'll try to do this very quickly. Rule 33B1 imposes a strict three-year statute of limitations, which we satisfied when we filed this motion by less than a week. And so we submitted with the motion the indications that we had then, and our reasons to believe why evidence justifying, newly discovered evidence justifying a new trial existed. And we admitted that this was not, what we had in our hands at that moment would not be sufficient. And we sought discovery and further disclosures, and ultimately we would need a hearing. But all of our opportunity to develop the record was denied by the district court's rulings. So on appeal, the government now faults the defendants by arguing that we're unable to prove the case conclusively for a new trial without having had a hearing. But nothing in Rule 33 requires that you have a winning case at the moment you file the motion, only that you, in good faith, believe you will have a winning case after the process of litigating the motion is concluded. The government now claims, for example, that the affidavit and testimony of Yang Yore, who is the witness whose testimony changed, was hearsay. Well, of course it was. It was documented that we were submitting with our motion. It was hearsay. But the content of it was within hearsay exceptions. It was against penal interest. And we were prevented by not having a hearing from making the non-hearsay showing. So for these reasons, the denial of the new trial motion was unfair and an abuse of discretion violating Rule 33 procedurally. Don't worry so much about the Clark, but tell me how it was against his penal interest.  And, in fact, he's changing testimony that he gave as a collaborator, risking his own sex reduction by changing his testimony to contradict the government's theory of the case. Does he have to tie it, though, to that particular murder for it to be against his penal interest? You would say no, because he wasn't there. He's not a murderer, is he? Right. He's talking to people who purport to know, who are within a conspiracy. So he's not implicating himself with respect to that? He's implicating himself in the criminal enterprise, for sure, showing himself to be a trusted person within the enterprise who others would confide in and discuss how the crimes were committed and by whom and why. Absolutely. The third point I wanted to touch on is the jury instructions. So here the trial judge committed in the jury instructions, in this case, exactly verbatim the error that caused reversal in La Torre Caccia. Right? So the record of this case very much vindicates the inferences that were drawn by the panel in La Torre Caccia that when Judge Fuste made this error, it was not an isolated slip of the tongue, but rather a legal error on his part about what constitutes rapeteering activity, because here you have, in another case of the same legal character, he makes the same error. So just as the panel in, I think it may have been Judge Barron writing in that case, found from inferences from that record that it was not an isolated slip of the tongue, here we have conclusive proof both by reference to the La Torre record and to our own record showing, which we've quoted carefully in the brief, that it's the very same error and requires reversal even on plain error review for the same reasons as in La Torre, on at least all but counts two and three, which are the only counts that don't have an element of rapeteering activity in them. If I recall, the government says, though, that there was plenty of evidence that would support, with respect to the other violations anyway, so we don't need to worry about this, even if it was error. You would say, again, that most of the evidence is cooperators, so it doesn't fall within the overwhelming realm. Do I have that about right, or is there more to it? I think that's the fallback position. I think I would have something to say before that. But, yes, it's important to say that in a plain error context with constitutional error of this kind, the error has to be, for the government to rely on the weight of the evidence, the evidence has to be overwhelming and uncontradicted, overwhelming and uncontested, and they do not have the and uncontested part here. It was hotly contested throughout the trial. But what I would also say is this is... I just saw that point. I wasn't quite clear whether that's right. I thought the word was uncontroverted, which is, I think, somewhat different than uncontested. I don't think so with respect, Judge Barron, in the context in which it comes up. I think this goes back to, you know, some of the Supreme Court cases about error in the perjury jury instructions, and the issue was materiality element, and the point was that whether the statement was material or not was not a controverted issue at the trial. Did I misunderstand? I'm sorry. Well, it's just... I mean, I would think that the mere fact that something is contested, no matter how weak the basis for contesting it was, it seems to me a surprising basis for saying, therefore, you've met your burden to show substantial prejudice on plain error. I would think you'd have to do more than simply have contested it. There has to be some, I would think, relatively strong basis... ...for making it at least plausible that the evidence that's against you isn't what it purports to be. Because it's constitutional error, because we're talking about whether the judge invited the jury to convict on a basis that is not against the statute. Well, that's true if we were on, maybe if the burden was on the government to show prejudice, but since it's plain error review, the burden is on you to show the prejudice. Yes, I know. That's exactly the point I'm trying to make, is that if it were a preserved error, the government would have to show it to be harmless beyond a reasonable doubt. And my understanding is that with the burden flipped to show prejudice in the plain error setting, the functional equivalent of the reasonable doubt rule for prejudice is this overwhelming and uncontroverted standard. That protects the high level... Yes, and we're just debating what the word uncontroverted means. You're treating it as it's enough if you contested the evidence. And I'm just saying that seems surprising to me because that would suggest even the fact that you contested on weak grounds would be enough for you to meet your burden on plain error review to show prejudice. I would have thought that you would have to show something more than that you contested this point below, but that there was some relatively strong ground such that we would think that actually a jury was... Sure, contested sufficiently to generate a reasonable doubt in the mind of a reasonable jury. Okay, so that's what I'm asking. What's the basis for that? Is that just because it was cooperated testimony? Yes. Yes, which this court has referenced in many of its cases as being a circumstance that prevents so-called overwhelming evidence from rendering an error harmless. But the...and remember here we are talking about Yates' error. We're not talking about, you know, three alternatives given to the jury, one of which is legally insufficient, factually insufficient. We're talking about three instead of two alternatives given to the jury to justify the conviction, one of which is legally invalid. So the jury, if the jury may have relied...the jury's assessment of the weight of the evidence does not excuse the possibility where it's a legal error in the...given to the jury in the alternative, the possibility that the jury may have relied... No, but, I mean, the worry is that, I mean, precisely because, as you point out, this seems to be not just a slip of the tongue but a legal mistake that the district court was making, the fact that it wasn't contested at trial and therefore the district court had no chance to be apprised of the error, that we're now post hoc going to look into whether or not the conviction should be thrown out when no challenge was made to it below. I think that one would be pretty sure that the jury was basing its decision on the error rather than not on the error. Right, and just as in Latore's case... They were never given a chance to correct the error. I'm sorry, I didn't let you finish. Well, I mean, you know, it's just a matter of what is the burden that you have on plain error review when you have a substantial amount of evidence against the defendant. It's not a case like Latore Cacho in which there's clearly more evidence of other crimes unrelated to the firearms than was true in Latore Cacho. That seems to me indisputable. Now, how strong that evidence is and whether it's strong enough to be able to show plain error is the question. I guess I'm just trying to get a sense of how we're supposed to think through that. The government emphasized the firearms throughout the trial, introduced the 40 photographs, physically laid them out during closing argument. They valued very much that these guns had been seized from my client at the time he was arrested, tied him personally to the guns, if the guns could be tied to the crime, which we say they weren't. But the jury was invited quite vigorously to rely on the firearms, which is the improper basis, as the basis for their conviction. But they were also invited to rely on a proper basis, which was murder. And drug dealing, yes. And the drug dealing. And the evidence of that is much stronger here than in Latore Cacho, where the evidence of the valid basis was very, very weak. I can't agree that it's strong when it's based on cooperating witnesses who are trying to avoid life sentences and, in some cases, death sentences. So a word on Bernard's question. May I? Yes. So Bernard Estacio filed a suppression motion, requires reversal also based on on-point circuit precedent, that is, the very same search was the basis for a reversal in Ramirez Rivera, a trial that arose from a group of separate defendants in the same indictment. And one of those defendants was the homeowner where the search occurred. So the government is left to argue only the contention that Mr. Estacio did not have standing to challenge this search. And that argument is just clearly wrong for two reasons, two related reasons, which are covered in Estacio's brief. One is, and this is not the term that's used in the brief, but this is what my colleague was saying, is judicial estoppel. The government prosecuted the homeowner for harboring a fugitive, that is, Mr. Estacio, in that home. So although they try to talk about it as an overnight guest situation where maybe he didn't have access to every part of the house, no, the government's very theory about what was going on in that house at the time of the raid is that this is where Estacio was living. He was where he was living as a fugitive, that he was being harbored by the homeowner and the homeowner's family. The fact that he was also apparently the sometime boyfriend of one of the daughters of the homeowner was not the main point, who was sometimes allowed to stay over in the house. The point is this was where he lived at that time. And so there's every reason to think that under the circumstances where he was being harbored in that home that he had full access to the home. So the government is not saying that he wouldn't have standing anywhere, but that, oh, well, these drugs were seized from a bedroom that was not the bedroom where he was sleeping. And those, you know, the guns were, or the drugs, I forget which, were hidden in a car in the garage. But if he's living there like a member of the family, then the inference is reasonable that he has access to the entirety of the property, not to just this corner or that like an overnight guest who's stuck because his car won't start before going home after dinner. So for that reason, the denial of suppression should be reversed just as it was in Ramirez-Rivera, and all of these defendants' convictions should be reversed and remanded for a new trial. Judge Barron, further questions at this point? Judge, do you have any authority that would suggest that the only way you can show harboring is to show that you gave the person full access to the house, as opposed to that you let them stay in a discrete part of the house? Not in a factual, on-point setting like that, no. Okay. It's just my understanding of the government's theory that led to the proposition. So I guess I'm just saying it would certainly be possible to harbor somebody while giving them access to only part of the house. I suppose that's true. You could hide the person in the basement or the attic or something. Yes, I can understand that that's possible. But at the very least, he would be entitled to a remand for a hearing on the details of this, because the motion was denied out of hand, even though he was asking for a suppression hearing. Well, why would that be? Don't you have the burden of showing that he did have access to the full house? The only argument you've made that he did is relying on the estoppel argument that because they say they harbored him, they have conceded that he had access to the full house. So we've just, to this clause, we've established that doesn't logically follow. So letting the record show that he had access to the full house. No, my point is that there is no detailed factual record. My point is that this is a burden on you to establish that he did have access to the full house. So I'm asking you, what in the record, as it comes to us, establishes that he did? Nothing in the record, as it comes to you now, shows that he did. But he does not have the burden to show standing without the benefit of a hearing. When he files a substantial suppression motion and it raises a question, if it raises a question of fact, then the parties are entitled to a hearing where each of them can present evidence and each can show. But have you properly evidence that would show you were prejudiced by not getting the hearing? Do you see what I'm saying? I'm just trying to get what's the indication that there is a basis for a hearing on whether he had access to the full house, as it comes to you, where that's in the record. That this is where he was staying on an ongoing basis. Okay. Thank you. Thank you. We'll hear from the government. Good morning. Mr. Acevedo, on behalf of the United States, may he please the court. First, as to the first argument made by the appellants, that they were about the public trial, as they have conceded, this is subject to plain error. Basically, what you have on the record is you have the testimony of two witnesses brought by the government that say there was no closure in the courtroom. And you have several witnesses from the defense saying that some of them were able to come in, some of their family members were not able to come in. Under the plain error, when you have two competing versions, there can't be clear and obvious error. And that's what we have here. So they won't be able to satisfy that element of plain error. When you look at their briefs, they failed in their briefs to argue that they were prejudiced, as well they failed to argue that it affected the fairness of the courtroom proceeding. So we submit to the court that they have waived this argument. Now, as to the argument of structural error, Your Honor, what the case law has shown is that for structural error, it has to affect the framework of the trial. And in this case, the framework of the trial cannot be affected, because even if the court were to find that there was a partial closure, there was no deprivation of the defendant's right to a public trial, which is what has been found to be structural error, the complete violation of the right to a public trial. There is nothing in the record that shows that there was a complete deprivation of any of the defendant's constitutional rights. So, therefore, we ask that the court deny these allegations that their right to a public trial was infringed. As to the admissions of unfairly and prejudicial demonstrative evidence, starting with the photographs, the defense has argued that there were credibility issues in this case because the case was based on cooperating witness. And as the court is aware, at the end of trial, the jury is given an instruction that they have to take their testimony with care. These photos that were presented in evidence corroborated the testimony of the cooperating witnesses as to how these murders went about. It also showed association because, as the court is well aware, we have to show that the members of this organization were part of an enterprise. And these photographs, when you look at them, it has multiple bullet holes, which shows that defendants would take turns shooting at the bodies of the victims. And this goes to show association. It also goes, in some instances, for example, it shows modus operandi. I mean, this gang was known for erasing faces. Defendant Rivera was known as the face eraser. And, in fact, there are photos shown with people with no faces because that's what he did. He erased faces. So this evidence was completely relevant to show and to corroborate the testimony of the cooperating witnesses, as well as the crime scene technicians and forensic pathologists that testified at this trial. Based on the evidence presented, we would submit that if the court were to find that it is unfairly prejudicial, it is harmless because of the amount of evidence presented in this case, which includes... Just before you get there, is it the government's position that all 60 photographs were necessary? Yes, they are, Your Honor. So there was no risk of unfair prejudice whatsoever? We submit that no because we can't look at these photographs in isolation. We have to look at them in the context of this trial and what this trial is about. This is a gang case, pretty much the most brutal gang that Puerto Rico has ever seen. And the type of murders that they committed were brutal murders, typical murders that you would see, for example, in the cartels in Mexico because they are leaving a statement when they commit those murders of intimidation. So they were not unfairly prejudicial because they depicted what, in fact, they committed, which were brutal crimes. And these 60 photographs out of hundreds of photographs that we had for these crime scenes, and there were multiple crime scenes in this case because we proved not only charged murders, but we also showed uncharged murders, but that nonetheless were overt acts of the Rico conspiracy. Did the government proffer any photographs that the judge determined should be kept out, or were they all admitted? I don't remember, Your Honor. But the defense were given all the photographs in discovery. As to the next point brought by the- Before you leave that, how many separate murders were detected in the photographs? There was the helicopter murder, the pepeque murder, the pet boys murder. There were at least five, six murders, Your Honor. And then how many, is it about ten photographs per murder that were shown? Approximately, that's the best of our recollection, Your Honor. Just from listening to you, I'm trying to-the arguments you gave for why it was necessary to show them was to show that there were multiple shootings and to show that the face was erased. So I'm just wondering why you would need to show-why there would need to be ten photographs for each of those murders to make those points. Well, Your Honor, the photographs not only depict the face erased, they would also show portions of the crime scene. Most of the time when we were presenting the crime scenes, you would go from general to specific, so the jury could see the case scenes, the location where it occurred, the position of the body. And there were some photographs that would be close-up of the actual body of the victim, but that wasn't the focus of all the photographs. All the photographs weren't shown just to show how the victim looked up close. There were certainly some photos of that, but that's not the only purpose. And those photographs were used by the crime scene technicians when they were describing the crime scenes, and some of the photographs when we're talking about the forensic autopsies were used by the pathologists to describe the wounds suffered by the victim and the manner and cause of death. As to the denial of a motion for new trial, the district court properly denied the appellant's motion for new trial. I'm sorry, before you move on to that, could you just address the prejudice, assuming that we disagreed with you and you thought there was error in the inclusion of that many photographs of this nature in the case, both as to the weapons and as to the murders, but we can treat them separately. How do you respond particularly to the argument that it was harmful that the defendant is making, which seems to rest on the fact that all of the evidence that ties these particular people to these offenses is cooperator testimony? Well, certainly there was cooperating witness testimony, but the amount of cooperating witness testimony here was substantial in the sense that cooperators would corroborate each other, because for some of the murders we had multiple cooperating witnesses explaining what happened. In addition to that, you would have ballistic evidence, but although you can't tie the actual casings to anyone through serological analysis, but you can nonetheless show the amount of firearms that were used in those murders. In addition to that, you have, as to Bernard, who was convicted of shooting down the helicopter, you have DNA evidence because the firearm that we argued was used shooting down the helicopter was a bloodstain next to it that matched him. So in conjunction, our argument is that it would be harmless based on the amount of evidence in this case. I mean, this is a lengthy trial where we presented multiple witnesses, I think over 50 witnesses in this case, and it's not just cooperating witness testimony, but cooperating witness testimony that was corroborated through each other, through the crime scenes, through the photographs, and through other physical evidence like the firearms and some drugs that we were able to see and show to the jury. Was the ballistics evidence of what was used to commit the murders, does that evidence tie to the weapons that were found? No. The ballistic evidence in the murder scenes would reflect how many firearms were approximately used in the murder and what caliber of the firearms were used in the murder. Other than the bloodstain that ties Bernard to the shooting down of the helicopter, is there any physical evidence tying any of these defendants to the crime? No. And to a point as to the firearms, when Mr. Rivera was arrested, which was seven months after the indictment, he was arrested with a cache of firearms, and those firearms were presented in evidence. Those firearms were not unfairly prejudicial because those firearms corroborated his role within the organization. He was a leader and a supplier of guns. In fact, in the Pequeque murder, there's testimony that he was the one that supplied the firearms to the team that extracted the shooter that killed Pequeque. In addition to that, as the record reflects, their main rival was La Rompe ONU, and that gang was not indicted until two years later in July 2015, and that war was ongoing at the time he was arrested. Moving to the next point as to jury instructions on firearms, racketeering, if you look at the record, throughout the trial, the court continuously emphasized that the racketeering acts in this case were murder and drug trafficking. In two instances, he mentioned firearms. The jury instructions that were given to the jury, the written jury instructions, did not contain firearms in them. But more importantly, the government, in opening, case in chief, closing, and rebuttal, emphasized that the two racketeering acts that our case hinged on was murder and drug trafficking. Now, unlike La Torre Cacho in this case, you have much stronger evidence of murder and drug trafficking than in the La Torre Cacho case, which, by the way, I also tried, and it was a much weaker case in the sense that it was just based on robberies and drug trafficking, and it was a lot less cooperators and a lot less additional evidence that we used to corroborate those cooperators. But more so, the jury in this case made a finding that all the defendants were guilty of murder and drug trafficking because they were all charged with these events and they were convicted of the drug trafficking conspiracy and the Vicar first-degree murders. In La Torre Cacho, Mr. La Torre Cacho was only convicted of the Rico conspiracy but was acquitted of the drug conspiracy. So these are completely different set of circumstances. Here, if the jury had not been given the erroneous statements as the firearms, they would have still found that the defendants were guilty of the charged crimes based on a proper racketeering act, murder and drug trafficking. So that's how La Torre Cacho is distinguishable from this case. As to Mr. Astacio Espino's motion to suppress, as the court pointed out, it is their burden to show spamming. In fact, the case law is that even to get a hearing on a motion to suppress, it is the defendant's burden to show spamming. And in this case, Mr. Astacio Espino had to show that he had spamming in two places, in an empty bedroom where one of the firearms was found and in a vehicle that was in a carport of the residence. And the drug and firearms were found in a hidden compartment in that vehicle. There is nothing in the record that shows that Mr. Astacio Espino had a reasonable expectation of privacy in any of these two locations. And it was their burden to show this, a burden which they did not fulfill before the district court and a burden that they did not fulfill again in their opening briefs where they failed to argue spamming. If the question is just standing, I mean, you wouldn't require a homeowner to establish that they have access to specific parts of the house. Exactly, Your Honor. And you're correct in that, but in this case, Mr. Astacio Espino is not a homeowner. He is someone that stayed several times there while he was a fugitive for the helicopter shooting. He was not a resident in that house, and we disagree with the defense's characterization But what's the authority for the rule that you're stating, that if you are an overnight guest, you then have to establish that you have access to all parts of the house? We've had several cases, Your Honor, in our briefs that show, for example, that you need to show standing in different locations. Does the court want me to look for the specific cases? So what I'm getting at is I'm familiar with the person that stays in one room as an overnight guest, and there's nothing to suggest that they had access to the entire structure. But here, I didn't have the sense that that was the situation. It was that he qualified as more than an overnight guest, but without any limitations that I was aware of in terms of his access to places. So why is the burden on him to have to show that he does have that kind of access? Yes, Your Honor. In this case, we disagree with the defense's characterization that he was more than an overnight guest. He was, in fact, an overnight guest who stayed several times, but only as overnight. In fact, if the court goes to the record of the suppression hearing, the court will see that police officers testified that they had to go into the house because the testimony of the CS, which, by the way, was Gutierrez-Santana, who eventually testified at trial, is that he would always leave early in the morning because he would stay there to hide from the police while he was wanted for a police helicopter. But the only thing is that he stayed several times, but he was not an overnight guest. He wasn't staying there on a continuum, or there's nothing on the record that supports that he was staying there as more than an overnight guest and staying more than several times. This is isolated incidents while he was being wanted for the police shooting, and that's why we're saying that he's only staying there as an overnight guest, and he has the burden of showing that he had a legitimate expectation of privacy in areas that were separate from where he was staying. In an empty bedroom, he wasn't staying in the empty bedroom. And in a car that was in a carport and was owned by the owner of the house was Ismael Cruz Ramos. So they're trying to say that they have standing over all of this when he doesn't, and they haven't met their burden of showing that he, in fact, did. And what is your response to the argument that there's a mismatch between prosecuting someone for harboring and the overnight guest suggestion that you're making? We would submit that there is no mismatch because you can harbor someone with one instance. We don't have to show that you harbored that he stayed there for a long time or that he was more than an overt guest to show that he harbored. And there's no evidence on the record that that's what we went after. In fact, the only evidence on the record that I think the defense points it out in their reply brief is to the pre-agreement of Ismael Cruz Ramos for harboring a fugitive. And I believe that the statement of facts there uses the word several times. And there's no suggestion in that statement of facts that he was anything more than an overnight guest. And we didn't proceed on a theory that he was anything more than an overnight guest. If the court has any additional questions? Judge Barron. I think I'm done. Okay. Thank you. Thank you, Your Honor. Perhaps I'll go in reverse order. On the suppression point, the only direct evidence of the witness saying that Bernard left in the morning strikes me as pretty silly, almost silly, very weak on the government's part. I leave my own house every morning. This is no evidence that I don't live there or stay there. More importantly, Judge Fuste referred when the defendant, Estacio, tried to advance his suppression motion, what the record shows is that Judge Fuste referred to Judge Smith's decision, the one that was reversed in Rivera-Ramirez, and brushed off completely the defendant's attempt to advance her own client's position and make her own showing. And just said, I'm going to rely on what Judge Smith said. And I think it was the prosecutor who said, well, standing isn't necessarily the same for the two defendants. And Judge Fuste says, I'm not getting into that. The other judge made a ruling, and we thought about these things together, and it was decided. So the defendant was prevented from making his record to show standing. Okay. On the gruesome photograph point, this actually is interesting that my friend, Mr. Acevedo, would bring up the erasing the face point, because this is the issue that Ms. Parsons was going to argue if she had enough time, that is, judge the comments by the trial judge, interjecting and commenting and showing his emotional involvement in these facts, focus on that fact. And he brought up that phrase himself with witnesses and asked them questions to get them to repeat it over and over again, emphasizing that point in just the unfair way that we point out in our briefs. The cautionary instruction, which the government references at the end, was remarkably weak. I focus on this in the brief. It was short and weak and certainly not designed to negate an emotional impact that this avalanche of evidence had. The fact that the cooperators corroborated one another is typical in a large number of cooperator cases and really is hardly better than showing an individual cooperator no idea whether they could coordinate their testimony or how they prepped or so forth. It's a very minimal attempt to bolster the case by saying that the cooperators were mostly consistent with each other. And then finally, the assertion that the war between the ONU and the RAMPE was continuing for another year or two after the ONU indictment, there is nothing in the record that shows that. I heard Mr. Acevedo say it just now, but when Mr. Rivera's attorney objected to the firearms, saying they're not intrinsic and they don't qualify under 45B to come in, the prosecutor didn't say, oh, no, the conspiracy was continuing and here's how we can show it. It's an assertion, which is completely outside the record. And then finally, on the public trial question, again, from when we talk about an insubstantial partial closure where you have to show prejudice, the cases that use that expression are the cases about where jurors are taken to sidebar and allowed to talk about personal reasons, embarrassing facts or other personal reasons. May I finish just this thought? Of course. Of why they should be excused from jury service. And when that occurs either in chambers or in the roving room or at sidebar, the cases are clear that that doesn't constitute a partial closure of the courtroom. That's not the kind of partial closure we're talking about here. What we're talking about is a marshal saying, according to the many people that were in the hallway outside the courtroom, only one member of each defendant's family can come into the courtroom at any one time and other members of the public are not invited in. So in that kind of situation, the prejudice is exactly like that of a complete closure. That is, you just can't show it affects the fairness of the trial. What it affects is the fundamental principle protected by the public trial clause of the Sixth Amendment. Chief Judge, I have two questions before he sits down. Of course. One of which is, do you have an answer to the Latorre-Cottrell point, government's observation that in this case the jury convicted on the drug dealing and the predicate drug dealing and the predicate murder offenses? They convicted on a separate count of conspiracy to distribute drugs. That's true. That's true. It's a distinction between the cases. It's not as strong a case as Latorre, but it's the same. I guess what I'm really asking is, is there any answer that you have to that? Because if I'm understanding it, you've got two predicate acts independent of the firearms that we know the jury did find. So if that's the case, what is the ground for saying that there would be prejudice? The jury would have to find for the racketeering-based offenses, Vicar and Rico, a complicated relationship between the underlying offenses and the enterprise by virtue of those particular offenses, which is not implicated in the convictions on the separate counts. I see. Okay. And then one other thing, which is a relatively small point, but it might matter for how we write the opinion. There's a reference in the brief on the 924C question to under the Puerto Rico murder statute that if a person was drowning in a bathtub and you came across it, came across that situation and did nothing, just the failure to act would be grounds for conviction under the murder statute, which I take it is relevant to the question of whether force was used and the force was satisfied, which might matter if our decision in Douglas. Yes, I think that's the argument that was being made there. Yes, it did not get sustained when the Supreme Court reviews that issue, which right then, battered on VMAT. Ms. Parsons, correct me if I'm wrong, but I believe that that example was quoted from Lefebvre's Treatise on Substantive Criminal Law as an example of how a first-degree murder can be committed without direct application of physical force. Yes, but I guess what I'm wondering, is there any indication that Puerto Rico law actually would apply the murder statute to a situation of just complete omitted acts like that? Do you have any case where Puerto Rico has ever applied its murder statute to such a situation? I don't think that either side cited such a case, one or the other, but it does come, the Puerto Rico statute, other than having a weaker intent requirement in the definition of intent, tracks typical American common law murder, first-degree murder requirements by using the term premeditation and malice. Okay. Thank you. Thank you very much. All right. Thank you all. Thank you.